

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

ENTERED
08/06/2018

| | | |
|---|---|---|
| IN RE: | § | |
| **FRANK  FLORES III; fdba FLORES** | § | **CASE NO: 16-70112** |
| **AUTO SALES** | § | |
| Debtor | § | |
| | § | **CHAPTER  7** |
| _____ | § | |
| | § | |
| **UNITED LEASING, INC.** | § | |
| Plaintiff | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 16-7023** |
| | § | |
| **FRANK  FLORES III** | § | |
| Defendant | § | **Judge Eduardo V. Rodriguez** |

## MEMORANDUM OPINION
### *Resolving ECF No. 1*

## I.   INTRODUCTION

The case *sub judice* presents the Court with the task of determining whether Frank Flores, III ("*Defendant*") should receive a full discharge allowed under the code or whether the claims of United Leasing, Inc. ("*Plaintiff*") should be excepted from Defendant's discharge based on Defendant's alleged conduct under 11 U.S.C. § 523 (a)(2)(B) and § 523 (a)(6).

## II.   FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, which incorporates Fed. R. Civ. P. 52 and 9014.  Any finding of fact more properly considered a conclusion of law, or any conclusion of law more properly considered a finding of fact, should be so considered.  On March 4, 2016, Defendant filed a voluntary petition

for relief under Chapter 7, Title 11 of the United States Bankruptcy Code.[1]  Bankr. ECF No. 1.[2]

In the Defendant's bankruptcy case, the Court extended the deadline to file objections to Defendant's discharge until August 25, 2016.  Bankr. ECF No. 56.  Accordingly, Plaintiff timely objected to Defendant's discharge when Plaintiff filed its complaint on August 25, 2016, initiating the instant adversary proceeding.   ECF No. 1.   Specifically, Plaintiff brought its complaint to except its claims against Defendant from discharge under 11 U.S.C. § 523 (a)(2)(B) and § 523 (a)(6).  *Id.*  Defendant filed his answer on September 30, 2016.  ECF No. 12.  Pursuant to this Court's procedures, parties filed a "Standard Joint Pretrial Statement" on August 18, 2017, ECF No. 30, and within that joint statement the following facts were stipulated:

a.  Prior to filing his chapter 7 bankruptcy, Defendant was the sole owner of Americorp, a Texas limited liability company, which was engaged in the trucking business.

b.  Defendant was actively engaged in Americorp's business and acted as its chief executive officer.

c.  Defendant is an "insider" of Americorp under 11 U.S.C. § 101 (31). Americorp is a chapter 7 debtor before this Court in No. 16-70208-M-7.

d.  Plaintiff provides comprehensive leasing and financial services to the business community. In this instance in 2013, Americorp applied to lease trailers through a third party broker, Balboa Capital Corporation ("Balboa"). Balboa collected financial and other information from Americorp and Defendant and forwarded the financial information to Plaintiff for its consideration.

e.  Defendant provided his personal Financial Statement as of April, 2013, to Balboa.

f.  Plaintiff agreed to lease twenty-five (25) 2014 Hyundai 53' HT hycube dry vans (the "Trailers") to Americorp.

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.

[2] Citations to the docket in this adversary proceeding styled *United Leasing, Inc. v. Frank Flores III*, 16-7023 (the "*Adversary Proceeding*"), shall take the form "ECF No. ——," while citations to the bankruptcy case, 16-70112 (the "*Bankruptcy Case*"), shall take the form "Bankr. ECF No. ——."

g.  Americorp executed a Master Lease Agreement, Addenda and Schedules in early August, 2013 (the "Lease"), with Balboa whereby Americorp leased the Trailers.

h.  Concurrently, Defendant executed a guaranty of all Americorp's obligations under the Lease (the "Guaranty").

i.  Shortly thereafter, Balboa assigned the Lease and Guaranty to Plaintiff with Americorp's and Defendant's written approvals.

j.  The Trailers, which are titled in Plaintiff's name, were delivered to and accepted by Americorp and placed in service.

k.  Defendant's Financial Statement indicates certain assets and liabilities as indicated in column A below, and column B below indicates corresponding facts:

| A. | B. |
|---|---|
| i.  Texas Community Bank Certificate of Deposit in the amount of $96,854.00. | i. Failure to disclose that CD was pledged |
| ii. 2004 Peterbilt Car Hauler with value of $175,000.00. | ii. Defendant originally purchased for $32,000 and sold several years later for $15,000. |
| iii. 2004 Ford F-150 Lariat Truck with value of $15,000. | iii.  Defendant sold this vehicle in 2007 or 2008. |
| iv. 2002 Harley V Rod valued at $12,000. | iv. Defendant sold this motorcycle in 2006, 2007 or 2008. |
| v. 2009 Mercedes Benz valued at $75,000. | v. Defendant purchased the vehicle under a salvage title for $32,000. |
| vi. 2000 Caterpillar Forklift valued at $20,000. | vi. Defendant sold this piece of equipment in 2010 or 2011. |
| vii.  1999 Hykster Forklift valued at $15,000. | vii.  Defendant sold this piece of equipment prior to April, 2013. |

| | |
|---|---|
| viii. Machinery and Tools valued at $75,000. | viii. Defendant sold this equipment prior to 2013. |
| ix. 2000 Take 3 Trailer Car Hauler valued at $7,500. | ix. Defendant sold this equipment prior to 2013. |
| x. 5201 N. Veterans Rd land and building valued at $1,200,000. | x. Value significantly less; Defendant had a contract that failed to close for the purchase price of $700,000. |
| xi. 2724 E. Alberta, Edinburg, TX, valued at $225,000. | xi. Defendant never owned this property. |
| xii. 5200 N. Veterans Rd, valued at $185,000.00. | xii. Undisclosed lien in favor of vendor burdened the property in 2013. |
| xiii. Liabilities. | xiii. Undisclosed obligation in the amount of $50,000 to William Horine. |

l.   Mexican truck drivers would pick up trailers from Americorp and take them into Mexico in accordance with the business practices of Americorp.

m.  Americorp began to experience severe cash flow issues and could not timely pay Mexican drivers. Some Mexican carriers refused to return trailers until they were paid in full.

n.   Fifteen Trailers may have been detained in Mexico and have not been returned to Plaintiff.

o.   Americorp defaulted on its obligations to Plaintiff under the Lease, and Plaintiff demanded the return of the Trailers.

p.   Plaintiff filed a general, unsecured proof of claim based on Defendant's guaranty of Americorp's obligations under the Agreement in Defendant's main case in the amount of $455,897.61, and no party, including Defendant, has objected to the proof of claim.

q.   Plaintiff recently recovered a Trailer, and the proof of claim should be credited in the amount of $13,500.00.

*Id.*  In the same pretrial statement, the parties stipulated that the only contested issues of fact to be determined at trial were: (1) "whether Defendant's Financial Statement was materially false;" (2) "whether Plaintiff reasonably relied on Defendant's Financial Statement in making its decision to lease the Trailers to Americorp;" and (3) "whether Defendant caused willful and malicious injury to the Trailers by sending them into Mexico."  *Id.*

The Court conducted a trial on Plaintiff's complaint on October 12, 2017.[3]  At the trial, Plaintiff called Ms. Martha Ahlers ("*Ahlers*"), Vice-President and Chief Operating Officer for Plaintiff, as a witness.  Min. Entry (10/12/2017).  In addition to her position with Plaintiff, Ahlers serves on the Equipment Leasing and Finance Association executive board, a trade association representing the Plaintiff's industry.  *Id.*  Ahlers testified to the following facts:

1. Plaintiff is approximately a half-billion dollar generalist finance company that has been in business for fifty-two (52) years.  Plaintiff conducts financing in twenty-five (25) different asset classes.  The trailers asset class, such as the transaction involving Defendant, is one of Plaintiff's top ten (10) earning asset classes;

2. Ahlers is responsible for the bottom line and overseeing credit and sales in her employment with Plaintiff.  She becomes personally involved in transactions dealing with more than $500,000.  In her experience, Ahlers personally handled thousands of transactions similar to Plaintiff's transaction with Defendant;

3. Plaintiff has a standard credit policy procedure in place.  According to that procedure, a prospective borrower's information is entered into Plaintiff's credit software where applicable underwriting can be viewed; then the credit spread is reviewed by a credit manager; next there is a write up by the sales representative handling the transaction;

---

[3] Citations to trial minutes shall take the form Min. Entry (date).

and then it is sent to management for approval.  Finally a credit team reviews the credit of the corporation, the personal guarantor (if one exists), and the stated value of the assets.  Plaintiff's transaction with Defendant followed Plaintiff's standard credit policy procedure.

4.  This was the first transaction that Plaintiff had done with either Americorp or Defendant.  Plaintiff found red flags in Americorp's financials.  So, to alleviate concerns, Plaintiff required a personal guarantee from Defendant.  As part of the personal guarantee, Plaintiff requested the Defendant's personal financial statement, which is the financial statement at issue in this case;

5.  Over the course of her career, Ahlers has reviewed thousands of personal financial statements.  She ranks the level of detail and strength in the personal financial statement provided by Defendant as an eight or a nine on scale of one to ten.  Defendant's personal financial statement did not raise red flags.  Furthermore, without Defendant's financial statement, Plaintiff would not have entered into the transaction because it was what "gave the personal guarantee teeth;"

6.  There was no outside audit or review of the personal financial statement.  Plaintiff only conducts audits when the transaction is over $1 million or other red flags are raised.  This is reasonable conduct and similarly practiced in the industry.  The consumer credit bureau report on the Defendant and the Defendant's tax documents did not raise any red flags.  Thus, Plaintiff entered the transaction with Defendant due to the confidence established by the personal financial statement provided; and

7.  Finally, if Defendant's personal financial statement truthfully reflected his financial condition, Plaintiff would not have entered into the transaction with Defendant.

Min. Entry (10/12/2017).  The Court finds the testimony of Ahlers extremely credible.

Following Ahlers' testimony, Defendant was called to testify, and his testimony can be summarized as follows:

1. Defendant was the owner/operator and founder of Americorp.  Profits and losses of Americorp flowed through to Defendant, and there were no managers or board of directors.  Defendant actively ran the business;

2. Defendant made all of the decisions regarding the acquisition and leasing of equipment. He estimated that he dealt with 15 different lending institutions and had been involved in multiple lease transactions with lenders and lessors;

3. It was common that lenders and lessors would ask for Defendant's personal financial statements in addition to asking for company paperwork when conducting these transactions.  Defendant knew that Plaintiff and other lenders and lessors would ask for his personal financial statement;

4. However, Defendant never updated his personal financial statement.  In fact, he knew that the personal financial statement was not accurate.  He simply thought that the personal financial statement was not important; and

5. Defendant signed his personal financial statement and gave it to Plaintiff when entering this transaction knowing that it was not an accurate statement.  Defendant did this with no intent to defraud.  But reiterated that he simply thought the personal financial statement was not as important; and

6. Lastly, Defendant described his actions concerning the personal financial statement as "reckless."

*Id.*

Defendant also provided credible testimony regarding the downfall of Americorp. *Id.* Defendant testified that as Mexican carriers began refusing to work with Americorp, they started holding the trailers hostage. *Id.* However, Defendant also testified that there were Mexican carriers who demonstrated that they would work with Americorp in good faith. *Id.* Upon that belief, and with the understandable desire to save his company, Defendant sent Plaintiff's trailers into Mexico. *See id.* Unfortunately for the parties, the Mexican carriers—who had indicated to Defendant their desire to maintain their business relationship with Americorp—reneged on their word. *See id.*

## CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and This Court's Constitutional Authority to Enter a Final Order

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and now exercises its jurisdiction in accordance with In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012). Furthermore, a determination on dischargeability of debts is a core matter under § 157(b)(2)(I)–(J). Because this is a core matter expressly brought under the Code, 11 U.S.C. § 523, the Supreme Court's holding in *Stern v. Marshall* is not applicable and this Court holds constitutional authority to enter a final order and judgment with respect to the core matter at bar. 564 U.S. 462 (2011). Finally, venue is governed by 28 U.S.C. §§ 1408, 1409. Here, venue is proper because the Court is presiding over the underlying Bankruptcy Case. *See* Bankr. ECF No. 1.

### B.  11 U.S.C. § 523(a)(2)(B) Exception to Discharge

Under § 523(a)(2)(B), a debt is not discharged if it is obtained by (i) use of a statement in writing; (ii) that is materially false; (iii) respecting the debtor's or an insider's financial condition; (iv) on which the creditor to whom the debtor is liable for such credit reasonably relied; and (v)

that the debtor caused to be made or published with the intent to deceive.   11 U.S.C. § 523(a)(2)(B); *see In re Orsini*, 289 F. App'x 714, 717 (5th Cir. 2008).   A party objecting to discharge must establish each of these elements by a preponderance of the evidence. *In re Cowin*, 864 F.3d 344, 349 (5th Cir. 2017) (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)); *see also In re Orsini*, 289 F. App'x at 717.   Although "exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start," *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997), "the Bankruptcy Code limits the opportunity for a new beginning to 'the honest but unfortunate debtor.'"   *In re Cowin*, 864 F.3d at 349 (quoting *Grogan v. Garner*, 498 U.S. at 287).

According to the parties' pretrial stipulations, the following necessary elements are uncontested: (i) the use of a statement in writing and (ii) respecting the debtor's financial condition.   ECF No. 30.   Therefore, in order for the Court to render its ruling on the issue, the remaining elements of § 523(a)(2)(B) that the Plaintiff must prove by a preponderance of the evidence are: (i) whether Defendant's statements were materially false; (ii) whether Defendant caused the statements to be made or published with the intent to deceive; and (iii) whether Plaintiff reasonably relied on Defendant's statements.   *See* § 523(a)(2)(B); *In re Orsini*, 289 F. App'x at 717; *In re Cowin*, 864 F.3d at 349.   The Court will address these three remaining elements in turn.

*1.   Whether Defendant's Statements were Materially False*

Turning to the first element of § 523(a)(2)(B)—whether Defendant's statements to Plaintiff were materially false—Plaintiff must prove this element by a preponderance of the evidence. Well-established case law defines a "materially false statement" as follows:

> A materially false statement is one that "paints a substantially untruthful picture
> of a financial condition by misrepresenting information of the type which would

normally affect the decision to grant credit." *In re Nance*, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987) (citing *In re Denenberg*, 37 B.R. 267 (Bankr. D. Mass. 1983)). "[I]n determining whether a false statement is material, a relevant although not dispositive inquiry is 'whether the lender would have made the loan had he known the debtor's true situation.'" *Matter of Jordan*, 927 F.2d 221, 224 (5th Cir. 1991), *overruled by Matter of Coston*, 991 F.2d 257 (5th Cir. 1993) (citing *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985)). Subjective reliance is not dispositive of materiality. *In re Slonaker*, 269 B.R. 595, 603 (Bankr. N.D. Tex. 2001). A document qualifies as materially false if it contains information causing it to be substantially inaccurate or omits relevant information. *Id.* at 602–03; *see also Matter of Jordan*, 927 F.2d at 224.

*In re McCraken*, No. 17-80084, 2018 WL 1440519, at *6 (Bankr. S.D. Tex. Mar. 19, 2018).

First, this Court must determine whether Debtor's personal financial statement was actually false. The materially false statement element for nondischargeability requires the statement create a "substantially untruthful" image of a financial condition by a misrepresentation of "information of the type which would normally affect the decision to grant credit." *In re McCraken*, 2018 WL 1440519, at *6 (quoting *In re Nance*, 70 B.R. at 321)(internal quotations omitted). A statement qualifies as materially false if it holds substantial inaccuracies or omits relevant information. *Id.*; *see also In re Slonaker*, 269 B.R. at 602–03.

Parties do not dispute that Defendant's personal financial statement contains substantial inaccuracies and omits relevant information that substantially misrepresented his assets and liabilities by over a total of $1,000,000. ECF No. 30. Specifically, Defendant's personal financial statement contains the following inaccuracies: (i) failure to disclose a pledged Texas Community Bank Certificate of Deposit in the amount of $96,854; (ii) an incorrect valuation of a 2004 Peterbilt Car Hauler at $175,000 despite an original $32,000 purchase price, which Defendant later sold for $15,000; (iii) inclusion of assets Defendant no longer owns totaling $144,500, including a 2004 Ford F-150 Lariat Truck with a $15,000 value, a 2002 Harley V Rod with a $12,000 value, a 2000 Caterpillar Forklift with a $20,000 value, a 1999 Hykster Forklift

with a $15,000 value, machinery and tools with a total $75,000 value, and a 2000 Take 3 Trailer Car Hauler with a $7,500 value; (iv) an inaccurate valuation of a 2009 Mercedes Benz at $75,000 although Defendant purchased the vehicle under a salvage title for $32,000; (v) the property at 5201 N. Veterans Rd was valued at $1,200,000 despite a failed contract to sell for a purchase price of $700,000; (vi) listing the 2724 E. Alberta, Edinburg, TX property, with a $225,000 value, although Defendant never owned the property; (vii) failing to disclose a lien in favor of vendor on the 5200 N. Veterans Rd. property; (viii) and failing to disclose an $50,000 obligation to William Horine. *Id.* at 5. Further, Defendant testified that he was aware of the substantial inaccuracies and omissions in his personal financial statement, thereby acknowledging that he misrepresented information and created a substantially untruthful picture of his financial condition. Min. Entry (10/12/2017). Accordingly, this Court finds that the overwhelming evidence demonstrates that Defendant's personal financial statement contains substantial inaccuracies and is a false statement. *In re McCraken*, 2018 WL 1440519, at *6.

This Court must also determine whether the substantial inaccuracies in Defendant's personal financial statement were the type of information Plaintiff relied on when it made a credit decision, which would make the actually false statement a materially false statement. Ahlers' testimony explained that Plaintiff requests a personal guarantee when red flags are raised during a check of a company's financials as a standard credit policy procedure. Min. Entry (10/12/2017). In this case, Plaintiff sought a personal financial statement when extending credit to Americorp. *Id.* Further, Ahlers testified that she ranks the level of detail and strength in personal financial statements and found Defendant's personal financial statement to be an eight or nine on a scale of one to ten. *Id.* Specifically, Ahlers testified that Plaintiff would not have entered into the transaction without Defendant's personal financial statement because it was what

"gave the personal guarantee teeth." *Id.* Based on Plaintiff's policy of requesting a personal guarantee and personal financial statement when necessary, Defendant's inaccurate and untruthful personal financial statement misrepresents the type of information that normally affects Plaintiff's decision to enter into a transaction. Here, the Court finds that the Plaintiff has objective procedures that can be affected by a misrepresentation of information, such as Defendant's false personal financial statement. *In re Nance*, 70 B.R. at 321.

Although not dispositive, the answer to whether a plaintiff would have entered into a transaction with a defendant had they known the defendant's true situation—as well as if there was subjective reliance on a false statement in writing—is influential when determining materiality. *Jordan*, 927 F.2d at 224; *In re Slonaker*, 269 B.R. at 602. Ahlers testified that Defendant's personal financial statement gave Plaintiff confidence in Defendant's personal guarantee, and that Plaintiff would not have transacted with Defendant had it known Defendant's true financial situation.  Min. Entry (10/12/2017).  Thus, Ahlers' testimony demonstrates that Plaintiff subjectively relied on Defendant's false personal financial statement.  Because Plaintiff subjectively relied on Defendant's false statement in writing and would not have transacted with Defendant had his true situation been known, the Court is further swayed that the materially false requirement of § 523(a)(2)(B) is satisfied. *Jordan*, 927 F.2d at 224; *In re Slonaker*, 269 B.R. at 602.  As such, this Court finds that Defendant's personal financial statement was materially false.  *See In re Nance*, 70 B.R. at 321; *Jordan*, 927 F.2d at 224; *In re McCraken*, 2018 WL 1440519, at *6; *see also In re Slonaker*, 269 B.R. at 603.

2. *Whether Defendant Caused the Statements to be Made or Published with the Intent to Deceive*

Next, Plaintiff must show by a preponderance of the evidence that Defendant caused the statements to be made or published with the intent to deceive.  Regarding this element, courts

have found that:

> [u]nless a debtor admits to having an intent to deceive a creditor, a court looks at the totality of the circumstances to infer whether the statement was knowingly false or made with a "[r]eckless disregard for the truth or falsity of [the] statement combined with the sheer magnitude of the resultant misrepresentation ...." *In re Morrison*, 555 F.3d 473, 482 (5th Cir. 2009) (quoting *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994)).  The court may consider such factors as the debtor's knowledge of and experience in financial matters, as well as whether the debtor exhibited a clear pattern of purposeful conduct when inferring deceitful intent of a debtor. *In re Morrison*, 361 B.R. 107, 124 (Bankr. W.D. Tex. 2007), *subsequently aff'd*, 555 F.3d 473 (5th Cir. 2009).

> Once a creditor establishes that a debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent. *Id.* (quoting *In re Bohr*, 271 B.R. 162, 169 (Bankr. W.D. Mo. 2001)).  Instead, "where a debtor testifies as to her subjective intent, the bankruptcy court must make a credibility determination, considering the debtor's testimony, along with other objective circumstantial evidence of the debtor's subjective intent." *In re Mercer*, 246 F.3d 391, 409 (5th Cir. 2001).  A debtor's intent to deceive may be inferred from his use of a false financial statement to obtain credit. *Matter of Young*, 995 F.2d 547, 549 (5th Cir. 1993).

*In re McCraken*, 2018 WL 1440519, at *9.

In the present case, Defendant's reckless submission of his false personal financial statement satisfies the definition of intent to deceive required for nondischargeability under § 523(a)(2)(B). *See id*.  Although Defendant testified that he knew his personal financial statement was inaccurate when he transacted with Plaintiff, Defendant also stated that he did not intend to defraud.  Min. Entry (10/12/2017).  Where there is no admission of intent to deceive, nondischargeability for a statement in writing made with intent to deceive requires the court to infer from the totality of the circumstances whether the statement was knowingly false or made with "[r]eckless disregard for the truth or the falsity of [the] statement combined with the sheer magnitude" of the misrepresentation.  *In re McCraken*, 2018 WL 1440519, at *9.  This Court finds that the Defendant's personal financial statement was knowingly false because Defendant

admitted in open court that he was aware of the inaccuracies at the time he tendered the statement to Plaintiff.

In the alternative, this Court also considers whether Defendant prepared his personal financial statement with reckless disregard for the truth.  The totality of the circumstances may include the debtor's experience in and knowledge of financial matters.  *Id.* (citing *In re Morrison*, 361 B.R. at 124).  Defendant testified that he made all the decisions concerning the acquisition and leasing of equipment and dealt with fifteen different lending institutions in multiple lease transactions as the owner/operator and founder of Americorp.  Min. Entry (10/12/2017).  Further, he testified that he knew Plaintiff and other lessors would ask for his personal financial statement to obtain credit.  *Id.*  Accordingly, this Court finds that Defendant has significant experience in financial matters relating to his position as owner/operator of Americorp.  Defendant also admitted that he signed and gave his personal financial statement to Plaintiff knowing it was not accurate; that his actions were reckless; and that he had knowledge of and experience in financial matters.  *Id.*  Additionally, the parties do not dispute the numerous inaccuracies in Defendant's personal financial statement.    ECF No. 30 at 5.  The Court finds that Defendant intended to deceive based on the falsity of Defendant's personal financial statement combined with the sheer magnitude of the misrepresentation of his assets and liabilities by over a total of $1,000,000.  *In re McCraken*, 2018 WL 1440519, at *9 (quoting *In re Morrison*, 555 F.3d at 482).  Therefore, because of Defendant's knowingly false personal financial statement given to Plaintiff with reckless disregard for the truth; the sheer magnitude of the resulting misrepresentation; and Defendant's knowledge of and experience in financial matters, given the totality of the circumstances, Defendant's acts satisfy the intent to deceive requirement under § 523(a)(2)(B).  *See id.*

Moreover, the Fifth Circuit has held that "a debtor's intent to deceive may be inferred from his use of a false financial statement to obtain credit." *Id.* (citing *Matter of Young*, 995 F.2d at 549). Additionally, when a defendant testifies to his subjective intent, the court must make a credibility determination, considering the testimony and other objective circumstantial evidence concerning the defendant's subjective intent. *In re Mercer*, 246 F.3d at 409. As discussed above, Defendant admitted that he knowingly gave Plaintiff a false personal financial statement and that he knew Plaintiff would ask for it before agreeing to lease trucks to Defendant, which allows this court to infer intent to deceive. Min. Entry (10/12/2017). And this Court finds that even though Defendant testified that he had no subjective intent to defraud Plaintiff, it does not overcome the inference of intent to deceive because Defendant also testified that his knowing use of a false personal financial statement was reckless. Therefore, this Court finds that Defendant's reckless use of a false personal financial statement in order to obtain a lease of Plaintiff's trucks demonstrates intent to deceive Plaintiff. *See Matter of Young*, 995 F.2d at 549; *In re McCraken*, 2018 WL 1440519, at *9.

3.  *Whether Plaintiff Reasonably Relied on Defendant's Statements*

Finally, Plaintiff must prove that it reasonably relied on Defendant's statements. In determining reasonable reliance, courts have found that for this element of § 523(a)(2)(B) to be satisfied:

> the creditor must have actually relied on the written statement, and that reliance must have been reasonable. *Field v. Mans*, 516 U.S. 59, 68 (1995). Partial reliance on a written statement is sufficient to satisfy this element. *In re Slonaker*, 269 B.R. 595, 606 (Bankr. N.D. Tex. 2001). The reasonableness of a creditor's reliance is a factual determination that "should be judged in light of the totality of the circumstances." *Matter of Coston*, 991 F.2d 257, 261 (5th Cir. 1993). As part of this determination, a bankruptcy court may consider such factors as: the existence of previous business dealings between the debtor and creditor that gave rise to a relationship; the existence of any "red flags" that would have alerted an

> ordinarily prudent lender to the possibility that the written statements relied upon were inaccurate; and whether a minimal investigation into the written statements would have revealed their inaccuracy. *Id.* "A creditor is not required to assume that a debtor is lying or misrepresenting facts" in its written statements. *In re Morrison*, 361 B.R. 107, 123 (Bankr. W.D. Tex. 2007), *subsequently aff'd*, 555 F.3d 473 (5th Cir. 2009).

*In re McCraken*, 2018 WL 1440519, at \*7. However, the factors enumerated in *Matter of Coston* simply point to what this Court *may* consider—but are not exhaustive—in examining the totality of the circumstances. 991 F.2d at 26; *see In re McCraken*, 2018 WL 1440519, at \*7.

First, before the Court can determine if Plaintiff reasonably relied on Defendant's personal financial statement, this Court must determine whether Plaintiff actually relied on Defendant's personal financial statement. *In re McCraken*, 2018 WL 1440519, at \*7 (citing *Mans*, 516 U.S. at 68); *see also In re Slonaker*, 269 B.R. at 606. A creditor actually relies on a statement in writing when it would not have entered the transaction if it knew the statement was false. *See In re McCraken*, 2018 WL 1440519, at \*7-8. Ahlers testified that due to Americorp's financials, Plaintiff needed a personal guarantee from Defendant before it approved the transaction. Min. Entry (10/12/2017). Further, Plaintiff required Defendant's personal financial statement before it was satisfied with Defendant's personal guarantee on Americorp's debt. *Id.* In fact, Ahlers testified that Plaintiff entered into the transaction with Americorp, and ultimately Defendant, because the personal financial statement "gave the personal guarantee teeth;" thus, Plaintiff would not have entered into the transaction had Defendant's personal financial statement reflected Defendant's true financial condition. *Id.* Ahlers' testimony demonstrates that Plaintiff actually relied on Defendant's statement in writing. *See id.* Moreover, Defendant did not provide any evidence to the contrary. As such, this Court finds that Plaintiff actually relied on Defendant's personal financial statement because the statement induced Plaintiff to enter into the transaction, and Plaintiff would not have leased the Trailers to Americorp had

Plaintiff known Defendant's personal financial statement was false. *In re McCraken*, 2018 WL 1440519, at *7.

Because the Court finds that Plaintiff actually relied on Defendant's personal financial statement, this Court must make a factual determination examining the totality of the circumstances to decide whether Plaintiff's actual reliance was reasonable. *In re McCraken*, 2018 WL 1440519, at *7. Factors this Court may use include: (1) past business dealings between the parties, (2) the existence of "red flags" that would have warned a reasonable lender of the possibility that the statement was inaccurate, and (3) whether a minimal investigation into the written statement would have uncovered inaccuracies. *Id.* (citing *Matter of Coston*, 991 F.2d at 261).

Pursuant to the testimony of the parties, Plaintiff had no prior business dealings with Americorp or Defendant. *See id.* However, Plaintiff is approximately a half-billion dollar generalist finance company that has been in business for fifty-two (52) years; conducts financing in twenty-five (25) different asset classes; and the Trailers asset class is one of Plaintiff's top ten (10) earning asset classes. Min. Entry (10/12/2017). Although there was not prior business dealings between Plaintiff and Americorp or Defendant, Plaintiff is a sophisticated lender in this particular area and has experience in these transactions.

Now the Court will turn to whether there were "red flags" in Defendant's personal financial statement that would have warned a reasonable lender of the possibility that the personal financial statement was inaccurate. *In re McCraken*, 2018 WL 1440519, at *7. The only evidence presented regarding industry standard was Ahlers' testimony; it went uncontroverted. Min. Entry (10/12/2017). Ahlers serves on the Equipment Leasing and Finance Association executive board, a trade association representing the Plaintiff's industry. *Id.* She

testified that, generally, industry standard is to conduct audits of personal financial statements when red flags are raised or when transactions are over $1 million. *Id.* Here, the transaction was not over $1 million and Defendant's personal financial statement did not raise any red flags. In fact, Ahlers, who has handled numerous transactions, rated the strength and detail of the personal financial statement as an eight or nine on a scale of one to ten. *Id.* And the fact that no red flags appeared in Defendant's consumer credit bureau report or tax documents only increases the appearance of validity in Defendant's personal financial statement. *See id.* Therefore, as Defendant's personal financial statement, bolstered by a clean consumer credit bureau report and tax documents, did not raise any red flags, Plaintiff's decision to enter into the transaction with Defendant without a further audit falls within standard industry practice and weighs in favor of Plaintiff's reasonable reliance. *But see In re McCraken*, 2018 WL 1440519, at *8 (finding a red flag existed when a lender learned of a borrower's alleged concealment of a prior lien).

Finally, there is no evidence that a minimal investigation would have uncovered all of the inaccuracies in Defendant's financial statement. *Id.* at *7. However, a minimal investigation might have revealed at least some inaccuracies. Although the Court would note that even a minimal title search on some of the properties disclosed in Defendant's personal financial statement would have uncovered inaccuracies, ECF No. 30, Plaintiff was not required to assume that Defendant was lying or misrepresenting facts in Defendant's personal financial statement. *In re Morrison*, 361 B.R. at 123; *see In re McCraken*, 2018 WL 1440519, at *7. And as discussed *supra*, there were no red flags that would have prompted Plaintiff to conduct a minimal investigation.

Despite not all of the factors weighing in Plaintiff's favor, this Court looks to the totality of the circumstances. *Matter of Coston*, 991 F.2d at 26; *see In re McCraken*, 2018 WL 1440519,

at \*7.  Here, the totality of the circumstances illustrates that: (1) Plaintiff is a sophisticated lender who is very familiar with the Trailer asset class; (2) industry standard did not call for an audit of Defendant's personal financial statement; (3) no red flags were raised in Defendant's personal financial statement; (4) no red flags were raised in Defendant's consumer credit bureau report; (5) no red flags were raised in Defendant's tax documents statement; (6) Defendant, owner/operator and founder of Americorp, was forthcoming with Plaintiff about Americorp's financials; and (7) Plaintiff was not required to assume that Defendant was lying or misrepresenting facts.  In light of the above, the Court finds that Plaintiff's reliance on Defendant's personal financial statement was reasonable.  *In re McCraken*, 2018 WL 1440519, at \*7.

In this case, Plaintiff  has proved by a preponderance of the evidence that: (i) Defendant's statements were materially false; (ii) Defendant caused the statements to be made or published with the intent to deceive; and (iii) Plaintiff reasonably relied on Defendant's statements.  *See* § 523(a)(2)(B); *In re Orsini*, 289 F. App'x  at 717; *In re Cowin*, 864 F.3d at 349.  Therefore, Defendant's liability to Plaintiff is nondischargeable under § 523(a)(2)(B).

## C.  11 U.S.C. § 523(a)(6) Exception to Discharge

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."  § 523(a)(6).  "The Supreme Court, in *Kawaauhau v. Geiger*, stated that '[t]he word "willful" in [§ 523](a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.'"  *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).  "The Fifth Circuit extended *Kawaauhau*'s reasoning in *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 603

(5th Cir. 1998), and stated that 'either objective substantial certainty [of injury] or subjective motive [to injure] meets the Supreme Court's definition of "willful ... injury" in § 523(a)(6).'" *Id.* "Injuries covered by section 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6)." *Int'l Beauty Prod., LLC v. Beveridge (In re Beveridge)*, 416 B.R. 552, 571 (Bankr. N.D. Tex. 2009) (citation omitted).

Here, Defendant sending Plaintiff's Trailers into Mexico does not meet the "willful injury" standard required for nondischargeability under § 523(a)(6)established by the Supreme Court in *Kawaauhau*, 523 U.S. at 61, and further defined by the Fifth Circuit in *In re Miller*. *Miller*, 156 F.3d at 603; *see also In re Keaty*, 397 F.3d at 270. First, nondischargeability for willful injury requires an intentional or deliberate injury, not merely an intentional or deliberate act that *leads* to an injury. *Kawaauhau*, 523 U.S. at 61 (emphasis added). Parties do not dispute that Defendant deliberately sent Plaintiff's Trailers into Mexico. ECF No. 30. And parties do not dispute that Plaintiff sustained an injury when Defendant sent Plaintiff's Trailers into Mexico and the Trailers were seized by the Mexican carriers. *Id.*; Min. Entry (10/12/2017). However, parties do dispute whether Defendant intentionally or deliberately injured Plaintiff's Trailers. ECF No. 30; Min. Entry (10/12/2017).

Defendant's credible testimony at trial regarding the financial condition of his company at the time of and reasoning for sending the Trailers into Mexico showed that Defendant needed Plaintiff's trailers and his business with Mexican carriers in order to save his company. Min. Entry (10/12/2017). Furthermore, Defendant's testimony demonstrated that Defendant acted with the understandable desire to save his company, not the deliberate or intentional intent to injure Plaintiff's Trailers by having them seized by the Mexican carriers. *Id.* Thus, although

Defendant intentionally and deliberately sent the Trailers into Mexico, which led to the Trailers being seized by the Mexican carriers, ECF No. 30; Min. Entry (10/12/2017), Defendant did not possess the requisite intent to specifically injure Plaintiff.   Min. Entry (10/12/2017). Accordingly, because there was no deliberate or intentional injury to Plaintiff, Defendant does not satisfy the willful injury requirement of 523(a)(6) as established by the Supreme Court in *Kawaauhau*, 523 U.S. at 61.

Second, nondischargeability for willful injury includes a defendant acting with an "objective substantial certainty [of injury]."   *In re Miller*, 156 F.3d at 603.  Whether there was an objective substantial certainty of injury to Plaintiff is a more difficult question.  When Americorp began experiencing severe cash flow issues, some, but not all, Mexican carriers had started holding Trailers hostage in Mexico until they were paid in full.  ECF No. 30.  However, Defendant testified that some Mexican carriers had manifested that they would continue to work in good faith with Americorp despite the issues, which went uncontroverted by Plaintiff.  Min. Entry (10/12/2017).  The Court fails to see how a reasonable person with a business experiencing "severe cash flow issues" would not work with existing business relationships making manifestations that the working operations between the parties would continue in good faith, especially when the future of the business depended upon the continuation of these operations. Furthermore, the Court at least doubts that the evidence that *some*, but not all, Mexican carriers had started confiscating trailers in exchange for being paid in full demonstrates that there was a substantial certainty that *all* Mexican carriers would begin seizing Trailers.  ECF No. 30; Min. Entry (10/12/2017).  Thus, because of the manifestations of some Mexican carriers to continue working with Americorp, there was no objective substantial certainty of injury to Plaintiff.  *See id.*  Therefore, Defendant's actions of sending the Trailers into Mexico do not constitute a willful

injury because there was no objective substantial certainty of injury to Plaintiff's Trailers. *In re Miller*, 156 F.3d at 603.

## V. CONCLUSION

This Court strives to grant every debtor before it a fresh start, but this Court will not freely give a new beginning to a debtor who does not deserve one. *See In re Cowin*, 864 F.3d at 349 (quoting *Grogan v. Garner*, 498 U.S. at 287). Here, for the reasoning above, the Court finds that Defendant is not entitled to his fresh start in relation to the debt owed to Plaintiff. More specifically, Defendant's debt to Plaintiff is nondischargeable under § 523(a)(2)(B) because the debt was obtained by (i) use of a statement in writing; (ii) that was materially false; (iii) respecting the Defendant's financial condition; (iv) on which the Plaintiff reasonably relied; and (v) that the Defendant caused to be made or published with the intent to deceive. However, while Plaintiff has proved by a preponderance of the evidence that Defendant meets the requirements for nondischargeability under § 523(a)(2)(B), Plaintiff has not demonstrated that Defendant's debt should be nondischargeable under § 523(a)(6). The Court finds that Defendant's actions do not rise to the level required for nondischargeability for willful and malicious injury by Defendant to Plaintiff or to Plaintiff's property. § 523(a)(6). Therefore, Defendant's debt to Plaintiff is nondischargeable solely under § 523(a)(2)(B) and not § 523(a)(6). The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED 08/06/2018.

Eduardo V. Rodriguez
United States Bankruptcy Judge